## No. 3056.

## Ex Parte Jim Jones.

**Habeas Corpus—Fact Case.**—See the statement of the case for evidence adduced on a habeas corpus proceeding for bail,—murder being the offense charged against the relator,—*held* insufficient to warrant the refusal of bail.

Habeas Corpus on appeal from the District Court of Mc-Lennan. Tried below before the Hon. Eugene Williams

A train on the Houston and Texas Central Railway was wrecked by obstructions placed upon the track by some person, on the seventh day of August, 1888, at a point in McLennan county, Texas, about three and a half miles distant from the town of Ross. The result of that wreck was the killing, by being crushed under the locomotive, of G. R. Moses, the engineer. Upon circumstantial evidence, implicating the relator as the person who placed the obstruction on the track, the grand jury of McLennan county indicted him for the murder of said Moses. Thereafter the relator sued out this writ of habeas corpus, upon the hearing of which he was refused bail, and was remanded to custody. From that judgment he prosecutes this appeal. The judgment is reversed and bail is awarded in the sum of two thousand five hundred dollars. By consent of the parties the case was submitted, on the hearing below, upon the record testimony reduced to writing at the examining trial. The evidence, in the order it appears in the record, that of the State preceding that of the relator, is reproduced in this report.

A. J. Cartrell was the first witness for the State. He testified that he was a fireman in the employ of the Houston & Texas Central Railway Company, and was serving in that capacity on the train of that company which was wrecked in McLennan county, Texas, on the evening or night of August 7, 1888. G. R. Moses, the engineer in charge of the locomotive, was killed in that wreck, by being crushed by the said locomotive. The witness received the first intimation of danger as he was thrusting wood into the furnace. The deceased then remarked to the witness: "Andy, we are gone up." The witness turned from the furnace immediately, and about that time the loco-

motive struck an obstruction, and the train was thrown from the track. The train ran the distance of about three hundred yards after leaving the rails. Cross examined, the witness said that the wrecked train was one of mixed cars. The witness did not see the obstruction before or at the time of the collision. When thrown from the track, the train was running at about the average speed of twenty-five or thirty miles an hour. The witness did not know at what hour the train next preceding the one that was wrecked passed over the point at which the wreck occurred. The engineer called for brakes about the time that the locomotive struck the obstruction.

J. M. Lee testified, for the State, that he was an engineer in the employ of the Houston & Texas Central railway, and was the superintendent of the division in which the wreck of August 7, 1888, occurred. The witness was on board of that train at the time of the wreck. He was seated, at the time of the collision, on the left hand side and near the west end of the second class coach. The train at that time was running at the speed of twenty-five or thirty miles an hour. When it reached a point about three and a half miles east of the town of Ross, the engineer sounded the whistle for brakes. He sounded three times at very short intervals. The brake was applied to the first coach at the sound of the first whistle, and about the third whistle witness felt a perceptible jar of the coach, and remarked to Gorman, who was near him: "We have struck something ahead." The train stopped shortly after the first jar or jolt, and witness and Gorman got out of their coach and went to the head of the train. Reaching that point they discovered that the engine had left the track on the left hand side, had turned "end for end," and was lying quartering on its back. The tender was just to the right of the engine on the other side of the track. Four badly wrecked cars were piled on top of the engine and tender. The witness and Gorman then began calling for the engineer (deceased) and the fireman, and within a few seconds they got a reply from the fireman, who was under the tender, buried entirely out of sight. About the same time they discovered the dead body of Engineer Moses under the reverse lever and the engine. It was quite evident that Moses had been killed by being struck by the engine. As soon as the fireman was extricated from the wreck of the tender, witness and others went back over the track to discover the cause of the disaster to the train. There had been a "cattle

guard" on the line of the track about three hundred and fifty yards back from the point at which the train stopped, and on reaching that point they discovered that all seven of the "slats" which formed a part of the guard had been recently torn from the frame. All of the said slats but two were found along the track, and they showed by marks and abrasions that they had been struck by the engine and had been run over and dragged along the rails. An examination of the truck, which had been torn entirely from under the engine, discovered the two remaining slats, securely wedged between the axles and the truck frame. The position of those two slats showed that the west ends of the same, when struck, were elevated in such a manner that the said ends, in passing under the truck, passed over the axles. Two of the slats were found on the track much nearer the cattle guard than the others. Pieces had been chipped from the slats by collision with the "flanges." From indications, the witness supposed that those two slats had been arranged in an elevated position so as to strike and lift the truck wheels from the rails. The obstructions thus described by the witness must have been placed on the track by some person or persons. They could not have been placed on the said track by any other than human agency. The train at the time was going in the direction of Waco. The collision occurred (as well as the Reporters can decipher the record) at fifty-two minutes past eight o'clock on the said evening of August 7, 1888.

On his cross examination the witness said that, as nearly as he could judge, the obstructions were in the cattle guard. "The cattle guard is eight feet long. It was not torn up in the wreck. The slats were removed and they were torn. There were seven slats. I know that these pieces were taken from the cattle guard. There could not have been any obstruction of this kind put on the track without its being seen—that is, the track would have been deranged. The engine was in fair fix, and was not very seriously injured. These pieces were jammed in the truck, and were carried about three hundred and fifty yards, and we found them in the truck of the engine. The engine was on the left side of the track, coming this way—towards Waco. It must have jumped the track on the left side, and I think the pieces must have been placed across the track. The slats were '3x8x8' feet, yellow pine, and must have extended entirely across the track from rail to rail. I am posted as to what trains run over that track daily. A mixed train

going west passed over that track about half past seven o'clock on that morning, and a yard engine left Waco in the afternoon and returned about six o'clock on that evening. Those were the only trains that ran over the track that day. The yard engine went above the point where the wreck occurred, loading ties. I don't know of any hand car passing over the road between that time and the time of the wreck."

On his re-examination by the State, the witness testified that he saw no loose ties at the point where the wreck occurred, and he estimated that the nearest pile of ties was at least three quarters of a mile from that point. There was no defect in the road bed that could have caused the wreck, and the obstructions described could have been placed on the track only by human agency. "A cattle guard consists of a rectangular box sunk in the ground and built of '12x12' lumber. The rails are carried by a piece of '12x12' lumber across the box, and the space is filled between the rails, and on each side by slats '3x8x8' feet long, parallel with the rails and sunk about ten inches below the top of the rails, and the cattle guard is '8x10' feet. At each end of this box is a fence built of plank. The obstruction was made, in my opinion, by placing two or three of these '3x8' slats across the track, just over the west side of the guard. On top of these pieces, across the track, were placed four or five slats running with the track, the lower or south end resting in the cattle guard, and braced against the bottom sills; and the two pieces placed on the west side, at the east end, on top of the pieces across the track, and the west end against the inside of the rail, so as to lift the wheels in passing over the obstruction."

Pat Gorman, an employe of the Houston & Texas Central Railway Company, who was with the witness Lee at the time of the wreck, and during the subsequent investigation of the cause of the same, stated that he had heard the testimony of Lee, and would adopt it in detail as his own testimony.

W. H. Farmer was the next witness for the State. He testified that he was an engineer in charge of one of the locomotives of the Houston & Texas Central Railway Company. He took his train over the track at the scene of the wreck at about forty-five minutes past five o'clock, on the evening of August 7, 1888, at which time the track was unobstructed and in good condition. The witness, when he passed that point, was taking his train to Waco. His train consisted of ten cars loaded with

cross ties. He had about seventeen men on board of his said train. He did not unload any cross ties either at the cattle guard or elsewhere on the line of the road, and no ties fell from his train either at that point or elsewhere on the track. He had a brakeman stationed at the rear end of the train through-out his said run. The ties were loaded crosswise on his cars, and were "staked" both on the sides and the ends of the cars. The witness, who was accustomed to running a tie train, was not in the habit of losing or dropping ties. Each of the said ten cars was loaded with new cross ties, which were taken to Waco. The witness did not know whether or not any other locomotive or train passed over the said track after he did and before the train was wrecked.

Tim O'Neal was the next witness for the State. He testified that he was a train conductor in the employ of the Houston & Texas Central Railway Company, and was on the wrecked train at the time of the disaster. That wreck occurred about three and a half miles east of the town of Ross, which point the train left a little after schedule time. The said wreck was caused by obstructions which were placed upon the track by some person or persons, and which could not possibly have been placed there by other than human agency. At or near the cattle guard described by preceding witnesses, the engineer in charge of the locomotive signaled three times for brakes. About that time the locomotive turned over and left the track. The witness, as soon as the train stopped, hurried to the head of the train, where he found the dead body of the engineer under the overturned locomotive. The fireman was under the tender. The witness had the fireman taken from under the tender, and, leaving parties at work to get the dead body of the engineer, he went to a house a short distance off to get a bucket of water, and en route, along the track, he observed the obstructions described by the witness Lee, which said obstructions had been torn from the cattle guard and placed on the track. After that the witness went back a short distance to place torpedoes on the track and to flag a train. In going to that point he saw a white man who told him that he had passed the cattle guard that evening.

On his cross examination, the witness said that he was mor-ally satisfied that the obstructions were placed on the track by human and no other agency. The witness saw two of the slats on the left hand side of the track, looking towards Waco, and another one between the second and third telegraph pole from

the cattle guard.   The telegraph poles were about two hundred feet apart, and he would estimate that the single slat above referred to was between four and six hundred feet distant from the cattle gap.   The slats were cut, but not broken, and showed the impression of the car wheels.   The brakes were set in response to the first signal sounded by the engineer.   The three signals were not above a second apart.   The witness felt the shock of the collision about the time the second signal for brakes was sounded.   The train left the track at the west side of the cattle guard.   The brakeman was at his post when the signal was sounded, and applied his brakes as soon after the signal as it was within human power to do it.   The train ran some distance after leaving the track before it was stopped by the jamming of the cars.   The witness saw one of the slats between four and five hundred feet from the cattle guard, and another one just behind the coach.

J. W. Miller was the next witness for the State.   He testified that he was not personally acquainted with the defendant, but had seen him a few times.   The witness did not know where the defendant lived, but his understanding from the neighbors was that he lived on Mr. Battle's place.   The house in which the defendant was said to reside was between seven and nine hundred yards distant from the point on the railroad where the train was wrecked on the evening of August 7, 1888.   The witness knew nothing about the killing of a colt of the defendant by the railroad.   The witness, on his way home from Waco, passed the point on the track where the wreck occurred about ten minutes past seven on the fatal evening.   The cattle guard was then intact and in good condition.   The witness knew that the timbers were all in place, because he walked across some of them to get to his home, about a half a mile distant.   Soon after the train was wrecked the witness saw a light signal placed on the track at a point towards Ross, and at about three hundred yards distant from the wreck.   He then saw a man, who it transpired was the conductor of the wrecked train, placing torpedoes on the track.   That man finally stopped at the light signal.   The witness had resided near Ross since long before the railroad was built, but he could not remember when the cattle guard was built.   The said guard had been kept in good condition, so far as witness knew, since it was first constructed.   At all events, it was in good order every time that he saw it.   The defendant's house, on Battle's place, was west

of the railroad. To go to the cattle guard from the said house,. it would be nearer to go through the field, and to go to the Elm Mott post office from the house, it would be necessary to cross the railroad track. It was about sun down on the fatal evening when the witness passed the cattle guard. At that time there were no obstructions on the track at or near that point. By the nearest and most direct route from the cattle guard to the house of the defendant the distance was between seven and nine hundred yards. There was no path leading from the house of the defendant to Geneva, but there was one north of it.

Con. McIntyre was the next witness for the State. He testified that he lived on the Houston & Texas Central railway, section number six, five miles north from Waco. He knew the defendant by sight. The defendant was at the station house on said section number six, on the Sunday preceding the wreck. He arrived at the house about half-past eleven o'clock, and remained about half an hour. He asked for a drink of water and then took a seat on a bench. He then said that he had some letters from Mr. Gary, the stock agent of the railroad company, in reference to a colt of his that had been killed by the railroad. He said that he could not read the letters himself, and asked if the witness could read them to him. Witness, who knew nothing about the defendant's colt, replied that he was unable to read.

J. J. Woodward testified, for the State, that he lived at the village of Geneva. He knew the defendant. The defendant received his mail at the Elm Mott post office. Some time before the wreck of the train near the cattle guard, the defendant came to the witness and told him that one of his colts had been killed by the railroad. He then asked the witness to write a. letter for him to Mr. Gary, the stock agent of the railroad, and the witness did so, mailing the letter at the Geneva post office. When he asked the witness to write that letter the defendant told witness to say to the said agent that his said colt which was killed by the railroad was an animal two years old and nineteen and a half hands high. Witness told him that a. colt nineteen and a half hands high was impossible. Defendant then directed the witness to report the colt as seventeen hands high, and worth one hundred dollars, and he would consent to nothing else. The witness then wrote the letter, describing the colt as a two year old, seventeen hands high, and demanding damages in the sum of one hundred dollars. Defendant re-

marked that "a man had to lose his property and get no pay for it," and left, saying nothing more about the colt.

Mrs. M. E. Smiley was the next witness for the State. She testified that she had talked to nobody about this case since she was summoned as a witness, except Mr. Battle, to whom she talked on the day prior to this trial. Mr. Battle came to Geneva and asked the witness what she knew about the case, and remarked that he thought the witness would make a good witness for the defendant. He said that he was looking for witnesses for the black man. Witness lived about a mile and a half distant from the Elm Mott post office. She went to the said post office on the evening of the wreck, and in going and returning she traveled the lane that passed the houses of Mr. Battle and the defendant. She crossed the railroad track about a quarter of a mile from where the wreck afterwards occurred. She crossed the track at that place on her return about six o'clock on that evening, reaching her home between six and seven o'clock. She talked to no person on that trip except her nephew, and to him only a few minutes. When on her way home, at about sunset, she observed defendant in Mr. Battle's field, in the edge of the corn patch, and on the side towards Waco. She did not observe him particularly enough to remember now the direction in which he was going, except that he was going towards the railroad track. At that time the defendant had his hat in his hand and his hand on his breast. He was walking up the fence from the direction of Battle's house towards the railroad. He was walking at his usual gait, and, had he gone on to the railroad on the line he was then traveling, he would have reached the track at a point about a quater of a mile distant from the cattle guard. Witness was only estimating the distance.

Cross examined, the witness said that it was just after six o'clock when she left Elm Mott on the fatal evening to go home. The witness was traveling on foot, and went direct to her home, which was nearly due west. When the witness saw the defendant on that evening as stated, he was going from the direction of Battle's house towards his own home. The witness did not know how far it was from the defendant's house to the cattle guard, but supposed that it was at least half a mile. No person was with defendant when witness saw him. She saw defendant's wife when she passed defendant's house, and as she passed Battle's house she saw Mrs. Battle standing in the door.

Aaron Henderson was the next witness for the State. He testified that he was a detective in the employ of Hall & Waller's detective agency at Waco. The witness visited the scene of the railroad wreck in company with Mr. Waller. This was on the morning after the wreck. Witness found some foot tracks within a few steps of the cattle guard. He followed that track towards the house of the defendant as far as the plowed ground extended, but could trace them no further. The tracks referred to by witness were the tracks of a man. He measured those tracks and afterwards applied the measure to the shoes of the defendant. The measure and the said shoes corresponded to a nicety. The defendant was then wearing the shoes that he was wearing now. The shape of those shoes and the shape of the tracks referred to by witness corresponded, and it was the opinion of the witness that the said tracks were made by the shoes the defendant was now wearing.

On cross examination, the witness said it was about nine o'clock in the morning on the next day after the wreck that he saw, examined and measured the said tracks. The witness saw a great many tracks about the place where the wreck occurred, but he saw no track other than the one mentioned which went away from the cattle guard. The impression of that track nearest the cattle guard that witness could find was between twenty and thirty yards distant from the said guard. From that point the witness followed it over loose, plowed ground, in the direction of the defendant's house for a distance of about one hundred and fifty or two hundred yards, to a small hollow overgrown with weeds, beyond which he could not find it. The track followed no path over the plowed ground. The witness could not say when that track was made. He did not think it was an old track, but could not say that it was not a few days old. At another point, in a path which led away from the cattle guard, but not towards the defendant's house, the witness saw other tracks, and among them a track which corresponded with the track that led away from the cattle guard over the plowed ground towards the defendant's house. The path mentioned led from the cattle guard towards the main branch. A person could travel that far over the said path and go thence to the defendant's house, the distance being somewhat greater than across the cotton ground, but the walking was much better. The witness saw other tracks in the cotton field (or plowed ground), but none near the track which he fol-

lowed to the hollow in the direction of defendant's house. That track was a run down track. The track in the path which corresponded with and looked like it was also a run down track. The witness could not find an impression of the said run down track going towards the cattle guard.

J. F. Willoughby was the next witness for the State. He testified that he lived about eight miles north from Waco, in the direction of Ross. The witness was on the track of the Houston & Texas Central Railway Company, not a great distance from where the wreck afterwards occurred, about sun rise on the morning of July 16, 1888, and on that occasion discovered an obstruction on the said track. The said obstruction was a solid railroad tie, somewhat shorter than full length, placed on the track lengthwise with the rails. The witness rolled that tie off the track, and about that time observed the defendant in Battle's pasture, at a point about three hundred yards distant, and a little above his house towards the railroad track. About the time that witness saw him the defendant squatted behind some bushes, and the witness supposed then that he did so to relieve himself at a call of nature. The witness did not know whether or not the defendant saw him at that time, but, if he looked in the direction of where the witness was, he could have seen witness, nothing intervening between them to obstruct the view. The witness had seen a small colt about or near the Battle place, but he did not know to whom it belonged. The colt referred to by the witness was not more than two or three weeks old when he saw it, and was the foal of a dun mare. The witness knew nothing about the pedigree of that colt, nor could he estimate its value. After removing the said obstruction from the track, the witness went on to the houses of his wife's father and grandfather. On his return to his own house, by the same route, he again observed that tie, and saw that, after he threw it off the track in the morning, it had been replaced on the track, and that it was thrown off the track by a passing train. It had been cut and split open by the "flanges" of the train, and the larger piece had been thrown some distance from the track. When the witness removed it from the track on that morning, he placed it at a point eight or ten feet distant from the track.

Cross examined, the witness said that he was positive that it was on the sixteenth day of July, 1888, that he found the tie on the railroad track, and saw the defendant two or three hundred

yards off in Battle's pasture. The witness struck the track on
that morning at a point between a quarter and a half mile north
from the obstruction, and walked the ties from that point to and
beyond the point where he found the said obstruction. While
walking the track the witness could have been seen from all
directions. While he, witness, was on the said track, he saw
no person other than the defendant, but while in his yard, be-
fore leaving home on that morning, he saw a man in McLel-
land's field, going up the track towards Ross. That man had a
valise in his hand. Witness did not know him, nor did he
speak to him. The witness, on his way home from his father-
in-law's house, did not see anybody on the railroad track. He
did not speak to the defendant when he saw him in Battle's
pasture on that morning.

Re-examinèd, the witness said that he was on the eve of
leaving his home to go to his father-in-law's house when he
first observed the man with the valise. That man was then on
the railroad track, about a quarter of a mile from where the
witness shortly afterwards found the tie obstruction. When
the witness last saw him, which was just as witness left home
to go to his father-in-law's, the said man was about a half a mile
from the obstruction, walking the railroad track towards Ross
station, from the direction of Waco. That man could have
struck the railroad at a point above (or towards Ross) the ob-
struction, either at the point where the track was crossed by
the Dallas road, or at the point where the track was intercepted
by the Elm Mott road. When the witness saw the negro (the
defendant) in Mr. Battle's pasture, he, witness, was at the point
where he found the tie on the track. He saw the defendant and
the obstruction at about the same time. The "tramp," or man
with the valise, when the witness saw him, was north of the
point where the tie was, and the defendant was seen about two
hundred yards west from that point. An hour or two elapsed
after the witness removed the tie from the track before he re-
passed that point on his way home. The defendant was still
squatting behind the bushes when the witness, having removed
the tie from the track, went on to his father-in-law's house.
On the Sunday morning before the wreck, which was the Sun-
day following the morning on which the witness removed the
said tie, and at a point about one hundred yards distant from
where he found the said tie on the track, he saw two ties re-
moved from the said track. Those ties were full length solid

ties. Witness did not see any tramps on the railroad on that Sunday. Those ties were at a point on the track north of the cattle guard, towards Ross. They were still there on the Wednesday after the wreck, but were not on the track. The witness never saw any ties at or near the cattle guard.

A. J. Cartrell, re-called by the State, testified that on Sunday morning, August 5, 1888, the second day prior to the wreck, he saw obstructions on the track not far from where the train was afterwards wrecked. The said obstruction consisted of two railroad ties, placed on the said track, about ten or twelve feet apart. Witness did not know how those ties got there. He did not remember that the train struck those ties. His recollection was that brakes were called, and that the train was stopped, when some of the train hands threw them off the track. The witness saw those ties thrown off on the east side of the track. On his cross examination the witness said: "I am fireman on the Houston & Texas Central Railway. My train ran over them (the two rails). That was right in about the place where the wreck was. They were ten or twelve feet apart, and between the rails."

John Richards testified, for the State, that he was the conductor on the train that went north from Waco on the morning of Sunday, August 5, 1888. At a point on the track about two miles south of Ross, he found two full ties on the track, which he caused to be thrown off. Those ties were "end to end" inside the track, and parallel with the rails. Witness did not think that those ties could have fallen from a passing train. The said ties were new ties, and witness knew of no new ties being hauled over the road about that time. His recollection was that ties were scattering along the line of the track about that period.

S. P. Christian testified, for the State, that he was the deputy post master at the Elm Mott post office. He knew the defendant, but never knew of the defendant giving his name as Smith. On the Saturday before the wreck the defendant requested the witness to read for him a letter which he got at the Elm Mott post office, which the witness did. It was after three o'clock in the evening when the defendant came to that post office. Witness did not know whether anybody was with him or not, nor did he know how long the defendant remained in Elm Mott on that evening. Defendant lived about a mile and a half from Elm Mott. The witness knew nothing whatever about the colt the defendant claimed to have been killed by the

railroad. He did not know how long it was before the wreck that he read the letter to the defendant.

Bob Clayton testified, for the State, that he was the husband of Lou Clayton. The witness met the defendant at Ed Oliver's house some days after the wrecking of the railroad train near the cattle guard, and went with him from said Oliver's place to Geneva. On the way to Geneva the defendant told the witness that he would want the witness's wife as a witness in his behalf on the trial of this cause, to prove that he was at home on the night of the wreck. The witness did not know and could not say where his said wife was on that night. Witness told the defendant that if his wife was at his, defendant's, house, then she was prepared to be a witness, but if she was not at his house then she could not appear as his witness. Witness then borrowed twenty-five cents from defendant, and went to Waco that night. Ed Oliver's house was about two and a half miles distant from Battle's house.

Lou Clayton, the wife of the preceding witness, testified, for the State, that she had discussed this case with her father and mother, and with nobody else. The witness was at Ed Oliver's house on the night of the wreck of the train, and remained in that house, in a sick bed, all of that night. She was not at the house of the defendant on that night. After the wrecking of the train, the defendant came to the witness and told her that he wanted her, if he should be placed on trial for this offense, to testify that she spent the night of August 7, 1888, at his house, designating an hour in the evening when she should state she arrived at his house. The witness had no recollection of ever hearing the defendant say that the railroad killed one of his colts, and that he was going to "get even" with the railroad.

On cross examination, the witness said that she was summoned as a witness on this proceeding both by Mr. Waller and Mr. Henderson, each of whom talked to her about what, if anything, she knew about the case. Henderson visited the witness's house twice before Waller called. He, Henderson, asked the witness to tell him all she knew about this matter, and stated several things which he said witness knew, but which she did not know and denied knowing. Among other things he said that witness saw two white men on the track, and that one of them pulled his hat down on his face. Witness then asked

Henderson why he accused defendant of wrecking the train, and he replied that he had pretty good evidence to show that the defendant was the guilty party. Witness did not see Mr. Henderson on the morning after the wreck. She was not at defendant's house after the wreck.

Ed Oliver, the father of the witness Lou Clayton, testified that Lou, who was then sick, spent the night at his house on the night of the wreck. The witness was present when the defendant came to his house to see Lou, but he did not see him talking to her. Defendant said nothing to witness about witness testifying in this case. Witness knew the woman Annie Davis, who lived with defendant, and he had seen her at his, witness's, house since the wreck and since the arrest of the defendant.

Cross examined, the witness said that his daughter Lou told him that while defendant was at his, witness's, house, he asked her to be a witness in his behalf. Lou had not been about the defendant's house for quite a week prior to the wrecking of the train.

Jennie Marshall testified, for the State, that the defendant was her brother. She had talked to nobody except Mr. Battle about this case, and had said no more to him about it than to ask him what he thought would be the result of this trial. The defendant came to the witness's house on July 11, 1888. Witness did not tell Mr. Waller that the defendant stayed at Burl Cator's house on the night of July 10, but she did tell him that defendant usually stayed at said Cator's when in town (Waco). Witness then asked Waller if defendant told him that he stayed at Cator's, and Waller said that he did. The colt that was killed by the railroad was the property of the witness, but was being cared for and looked after by the defendant, and was in the possession of the defendant. Witness did not know when that colt was foaled, nor did she have an idea as to its age when killed. The colt's dam, a dun mare, also belonged to the witness.

J. M. Waller testified, for the State, that he was one of the proprietors of Hall & Waller's detective agency. The witness was employed to investigate the circumstances attending the wreck of the train on the Houston & Texas Central railway, near Ross in McLennan county, on the seventh day of August, 1888. He arrested the defendant on Wednesday, August 8, 1888, in response to a telegram from the manager of the said railway

company, the witness repaired to the wreck, and reached it about eight o'clock, immediately after the body of Moses was removed from under the engine. The wreck was caused by col·lision with timbers which some person had wrenched from the cattle guard, about four hundred yards northwest of where the engine was lying, and placed on the track. Witness's observations on the ground were about the same as those of the State's witness Lee. The defendant lived northwest from the said cattle guard, seven hundred and ninety-five yards distant. The witness discovered the track of a negro's foot near the cattle guard, and found it afterwards to correspond with the foot of the defendant. A road which passed the house of Mr. Battle and the defendant, and led thence to Geneva, crossed the railroad track at a point about two hundred and fifty yards north of the cattle guard, and at and near that crossing the witness saw a number of new ties which had been placed there, along the line of the track, quite recently before the wrecking of the train. At a point between seventy-five and a hundred yards from the point where the said road crosses the track, and in the direction of Waco from that crossing, the witness saw two, three or four very large ties, which were lying near the track. On the next morning he saw some cord wood lying near the track at that point. "The largest of the three or four ties mentioned—which would weigh three or four hundred pounds—was placed on the track on the night of July 10. The south end of that tie was placed against the ties on the outside of the track. I find upon investigation that five different attempts have been made to wreck the train in that space. After investigating the matter for a week, I arrested Jim Jones. I did not put him in jail the first night, and he pretended to be crazy until I put him in jail. The defendant was excited and would have escaped if he could."

Cross examined, the witness said: "I found the five attempts to wreck the train there myself. The ties lie with one end on the dump. All of the ties have been placed off the rails and off the ties. I did not see the ties across the track, and my impression was gathered from seeing the ties and other evidence gathered up."

J. J. Woodward and T. R. Battle testified, for the State, that they could go from the house of the defendant to the cattle guard on the railroad where the collision occurred, and back to the said house, within fifteen minutes.

John E. Garey testified, for the State, that he was the stock and claim agent for the Houston & Texas Central railway company. The defendant filed with the witness a claim against the said railway company as damages for killing a colt. The witness offered the defendant thirty dollars in settlement of the said claim.

The State closed.

C. R. Battle was the first witness for the defense. He testified that he had known the defendant seven or eight years. The defendant was living on the witness's place, near the scene of the wreck, at the time the wreck occurred, which was on Tuesday night, August 7, 1888. The witness was at home on that day, and the defendant was at his house, at work on that day. He worked during the forenoon with one of the witness's sons. He loaded two cords of wood for the witness in the afternoon, quitting work for the witness an hour or an hour and a half before sun down. From that time until sun down he pulled fodder on his own place for himself, his said place being about four hundred yards distant from the residence of the witness. The place where he worked at his fodder was about two hundred yards from the witness's house. He commenced work in his fodder about an hour before sun set, and witness caught glimpses of him from time to time, but did not keep him in view all of the time. The defendant's house was about eight hundred yards distant from the cattle guard, and the point where he was at work in the fodder was about a thousand yards distant from the said guard. To get to the cattle guard from the point where he was at work in his fodder, the defendant would have had to pass through or over two wire fences. It was the judgment of the witness that there was not sufficient time for the defendant to have gone from the point in the fodder field where the witness last saw him to the cattle guard, between that time and the time when the wreck of the train occurred. Defendant left his fodder field about sun set and came "there" (witness's house?). After supper the witness went out on his gallery, where he found the defendant. The defendant remained there until very near the witness's bed time, which was eight o'clock. Annie Davis was at witness's house at the same time. She came there to get medicine for a sick child. After leaving the fodder field the defendant cut some stove wood, and then went around the house to the kitchen, where the witness was, and it was then so dark that it

was found necessary to light lamps. Between that time and the time when he left his fodder field, at sun down, the defendant could not have gone to the cattle guard and returned. Defendant and Annie Davis left the witness's house together. Witness did not think it was quite eight o'clock, but it was quite dark. The witness was lying down when the collision and wreck of the train occurred. He heard the signal whistles, and he heard the train stop. The witness's three sons and his nephew then left the house to go to the point where the train had stopped. The defendant, for the time the witness had known him, had borne a good reputation as a law abiding citizen.

Cross examined, the witness said that he had taken an interest in this case on behalf of the defendant, but had not employed counsel to represent him. The witness remembered seeing and talking with Mr. Waller, but he had no recollection of telling Waller that it was fifteen minutes past seven o'clock when the defendant left his house on the evening of the wreck. Witness told Waller that it was not later than twenty minutes before eight o'clock when the defendant left his house, but that, possibly, it might have been a little earlier. The witness did not know whether or not his sons and nephew had retired when the wreck occured. They left very soon afterwards for the scene of the wreck, and for a while during their absence the witness promenaded on his gallery. The witness remembered the colt of the defendant that was killed by the railroad, but knew nothing about its pedigree. When killed, that colt was about five weeks old. It was not seventeen hands high. Estimating the value of that colt as a farmer familiar with the value of stock, the witness would say that, when killed, the said colt was worth about ten or fifteen dollars, but the defendant refused to accept thirty dollars in settlement of the claim for damages he preferred against the railroad for killing it. The witness had never detected any indications of insanity about the defendant, and he had never heard of the defendant's head having been crushed or otherwise injured. The witness did not have a conversation with the defendant on the day of the wreck, but several days thereafter the defendant came to him and asked him to write a note for him to the effect that "the man who wrecked the train is not here now. He is gone and left the country." When he requested witness to write that note the defendant said: "I will drop the note on

the track, and they will find it and think the man who done it has gone, and then they wont bother me." Refusing to write that note for him, the witness told him that it would not be proper for him to send such a note to the railroad officials. A bull that belonged to the witness was killed about six months prior to this trial. The defendant found the body of that animal and told the witness that he thought it was killed by the railroad, although the body was not on either the railroad track or dump. Witness remarked that he would go and see the body of the bull. Defendant, who had an axe in his hands, said that he would go along and break the animal's legs to make it apparent that the animal was killed by collision with the train. The witness did not think the defendant was a good man. He did not, however, know what was the reputation of the defendant among his neighbors. He never heard the defendant say that he would make the railroad sick of having killed his colt if they did not pay for it. The witness never knew of the defendant living in Montgomery county, Texas. Defendant's right name was Dick Marshall. He came to witness's neighborhood in company with a negro woman. He told the witness that he changed his name so that he and the negro woman could not be traced by the woman's husband. Annie Davis was living in the house with the defendant, but the witness could not say that he ever heard the defendant speak of her as his woman. The officers had been twice to defendant's house after him at the time that defendant asked witness to write the note for him to drop on the railroad track.

H. Battle was the next witness for the defense. He testified that he saw the defendant with his, witness's, brother, about three o'clock on the evening of the fatal Tuesday. When the witness reached home—the house of the preceding witness—at about thirty minutes before sun down, the defendant, according to his recollection, was there. A few minutes after the witness got home, the defendant left that house, went to his own home, and soon returned. It was about sun set when the defendant got back to the house of the witness's father. He could not possibly have gone to the cattle guard and returned between the time he left C. R. Battle's house, and the time he returned at sun set. The cattle guard was at least twelve hundred yards distant from C. R. Battle's house. Returning to the said house at sun set, he remained until nearly dusk, when he and Annie Davis, the woman who lived with him, left the house

together, and went off towards his, defendant's, house. The witness did not know at what time the said woman came to his father's house. She came to get some medicine for a sick child, which she obtained from the witness's wife, who, at that time, was in the room of the witness's mother. When the medicine was measured out for Annie Davis, the witness was in the dining room, reading a newspaper by lamp light. It was after the said medicine was given to Annie Davis that she and the defendant left together, going towards the defendant's house. Between ten and fifteen minutes after the defendant and Annie Davis left his father's house, the witness went to bed, and before he had been in bed ten minutes he heard the collision of the train with the obstruction which caused the wreck. As soon as he heard the signal whistle and the crash he remarked to his brother that he thought a wreck had occurred on the Central railroad. The witness then got up, and he and his two brothers and his cousin went to the wreck. They went to the wreck by the defendant's house, and on their arrival at that house they found the defendant in his doorway, putting on his shoes. The witness asked him if he heard the crash and if he wanted to go to the wreck. He replied that he did hear the crash and that he wanted to and would go with the witness and his party, and he did go with them. It was between seven and eight hundred yards from the house of the defendant to the cattle guard by the nearest route, and in going to the guard by that route the party had to and did go through four wire fences, two of which were very close and taut and exceedingly difficult to get through. Defendant returned from the wreck with the witness, his two brothers and cousin. Witness saw no person but defendant at defendant's house, but did not enter the house.

Cross examined, the witness said that he went to Professor Boggess's place between one and two o'clock on the evening of the fatal Tuesday. He helped the defendant and others load fodder on his father's place in the forenoon. When the witness got back home a short time before sun down, the defendant was cutting wood in witness's father's back yard. Defendant left C. R. Battle's house about sun down, went home and soon returned. Guessing at the time, witness would say that it was about seven o'clock when defendant went home from C. R. Battle's, and it was about twenty minutes past seven when he returned to Battle's house. Annie Davis remained at C. R. Battle's house about fifteen minutes, and left it in company with

the defendant. Witness did not know that defendant and Annie came to the said house together. Again guessing at time, the witness would say that it was about twenty minutes before eight o'clock when the defendant and Annie Davis left C. R. Battle's house. Within the next ten minutes the witness went to bed, and within the next ten minutes he heard the signal for brakes, and the crash on the railroad. It was about fifty minutes past seven o'clock by witness's time when he heard the whistle and the crash. Witness's time was about twenty minutes slower than the railroad time, which would make it about fifteen minutes past eight o'clock by railroad time when the collision occurred. The witness desired to impress upon the mind of the court that all of his statements as to time were mere estimates.

Continuing on cross examination, the witness said that he had a conversation with Lee Jenkins and Dan Ford, on the day after the wreck, but he did not tell either of those parties that the defendant had said to him that "if the railroad authorities did not pay him for killing his colt he would make them sick of it." The witness was of impression that defendant got his supper at home after leaving the house of C. R. Battle, but, as a matter of fact, he did not know that the defendant ate any supper on that night. When the witness and his party reached the defendant's house en route to the wreck, they found the defendant in his door, putting on his shoes, and rubbing his eyes as if he had been asleep. He could not have slept long, as he had but recently left C. R. Battle's house, and if he ate supper after he got home he could not have been asleep at all. The witness neither saw nor heard Annie Davis at defendant's house, when he passed that house, either as he went to or returned from the wreck. In going to defendant's house en route to the wreck, the witness and his party traveled the direct road from C. R. Battle's house to defendant's house,—the same road over which the defendant and Annie Davis traveled a short time before, in going home from Battle's house. From defendant's house the defendant and witness's party went straight through the field and to the right of the cattle guard until they struck the lane at a branch which crossed the road. The witness, on his way to the wreck, did not go to the cattle guard, but "passed about a hundred or a hundred and fifty yards west of the place where the cattle guard is, and struck the track about sixty yards of it." The witness remained at the wreck about

an hour and a half. He and his party then started home, going up the road towards Ross. They went "over the cattle guard, and on up the road, and across a bridge and both cattle guards." He then "went on beyond the broken cattle guard, and there turned down the road, and followed that lane to the end of it; then we kept straight ahead for about seventy-five yards, and then went just west home. We did not come back home the way we went. After leaving the lane we went about west from there home."

Chew Battle, another son of the witness C. R. Battle, testified for the defense that he lived with his father and was at home at the time the wreck occurred, and at sun down on that evening. The defendant was at the house of C. R. Battle at sun down, and left that house at about dark. It was eleven hundred and ninety-five yards from the house of C. R. Battle to the cattle guard on the railroad track, near which the wreck occurred. Three wire fences intervened between the said house and the cattle guard. There was no time between sun down and dark that the defendant could have gone to the cattle guard without the witness knowing it. Estimating time only, the witness would say that it was about eight o'clock on that night when the defendant and Annie Davis left C. R. Battle's house. The signal whistles which preceded the crash of the collision only a moment or two were sounded about twenty or twenty-five minutes after defendant and Annie Davis left C. R. Battle's house. The witness, who was in bed when the signals sounded, got up at once, dressed and, with his brothers and cousin, started to the wreck. They went by defendant's house, and found him in the door. Witness asked him if he wanted to go to the point on the railroad whence the noise proceeded, and he replied that he did. He then joined the witness's party and went with them to the wreck, and afterwards returned with them. The party did not traverse the same route in going to and returning from the wreck. They crossed the field and the wire fences in going to the wreck. They returned across the fields, but over another route, traveling a path.

Cross examined, the witness said that he had a conversation with Detective Waller on the morning after the wreck, but could not remember that he then told Waller that it was fifteen minutes past seven o'clock when the defendant left C. R. Battle's. If witness made that statement to Waller at that time, then that statement was correct. The witness did not know

the exact time when the wreck occurred. When witness and his party, on their way to the wreck, reached defendant's house, they found defendant in his door, and engaged apparently in putting on his shoes. The three fences crossed by the witness and his party in going to the wreck were wire fences. They got through those fences by pressing the wires together and crawling through between them.. Those fences occasioned some delay. The party were longer in getting to the wreck than they would have been had it not been dark, and had not the ground over which they passed been overgrown with weeds. The witness, his cousin and the defendant were employed during the afternoon of the fatal Tuesday in hauling wood to C. R. Battle's house. They commenced work at about ten minutes before three o'clock. When they quit hauling wood, about an hour before sun set, the defendant went to his fodder field to work for himself. Witness, however, did not see him at work in his fodder field, nor did he see him at all for twenty or thirty minutes after he left to go to his fodder field. In the opinion of the witness, the defendant could have gone from C. R. Battle's house to the cattle guard and back within twenty or thirty minutes. Defendant came back to Battle's house before sun down, and remained there until about dark. He left the last time about dark, and not more than fifteen minutes from that time elapsed before the witness heard the signal for brakes and the collision of the train with the obstructions. It was about or a little before eight o'clock when the defendant left Battle's house the last time. The train time at the cattle guard was about ten minutes past eight by the time piece at Battle's house.

Continuing on cross examination, the witness said that he talked to Lee Jenkins and Dan Ford on the evening of, but after the wreck. Some time before the wreck the defendant remarked to the witness that, if the railroad people did not pay him for the colt the train killed, they would regret it. The witness could not remember where he and the defendant were when defendant made that remark to him, but it was the only time that defendant ever said anything to him about the matter. The witness could not remember what, if any, reply he made to that remark. The witness did not know, until told by Mr. Waller, that several attempts to wreck the train near the cattle guard had been made. When the witness and his party, en route to the wreck, reached defendant's house, and asked him

if he did not want to go with them, he asked them if they were not afraid of being arrested if they went to the wreck. He said that he was afraid the railroad men would suspect him of placing the obstructions if he went down there. The witness made no other reply to defendant's remark than that he was not afraid to go. On the next day after the wreck the defendant asked the witness if there was any way of getting out of Texas by water. He did not say that he wanted to get out of Texas. The witness replied to defendant's question that he could ride out on horseback, and remarked that he, witness, would not talk about leaving the State unless he had done something to leave for. After that the defendant said something to witness about leaving, and witness told him that it was useless for him to talk about leaving, because, even if he left, the officers would get him if they wanted him. Witness had no recollection of the defendant ever saying anything to him, or to any body in his presence, about getting witnesses to prove that he was at home at the time of the wreck. He did say that if the witness, his brothers, cousin and father would "stick" to him, he would come out all right. It was the recollection of the witness that he asked the defendant what he meant by "sticking" to him, and that defendant walked off without replying. This occurred before the arrest of the defendant, but witness was unable to say whether it was before or after he learned that the defendant was suspected of the offense.

On his re-direct examination, the witness said that he knew Henderson, Ford, Waller and Jenkins, and regarded each of them as an officer. Between the time of the wreck and the times of the witness's conversations with defendant, detailed above, all of the said officers had been to the house of the defendant. The witness had no personal knowledge of any prior attempts to wreck the trains. The witness was not able to say whether the defendant, in going with him and his party to the wreck, went willingly or unwillingly. He did, however, go of his own accord. The witness knew as a fact that a negro (stranger to witness) stayed at and about the defendant's house during the week succeeding the wreck. The witness did not go to sleep between the time defendant left C. R. Battle's house at dark and the time of the wreck of the train—fifteen minutes later.

On re-cross examination, the witness said that he did not prevail upon the defendant to go with him and his party to the

wreck by taking him by the nape of the neck. He did not force
the defendant to go to the wreck. Whether willingly or un-
willingly, the defendant went to the wreck of his own accord.
The party had progressed at least a hundred yards beyond de-
fendant's house towards the wreck when defendant asked if
they were not afraid of arrest, and stated that he was afraid
of being suspected of having placed the obstructions if he went
to the wreck. No stop was made by the party between the
defendant's house and the wreck. The witness did not mean to
be understood to testify that the strange negro stayed at and
about the defendant's house all of the time during the week
succeeding the wreck. He saw the said negro at defendant's
house more than once, but he could not say how often. He saw
that negro at defendant's house on Friday, the said negro
having spent the previous night at that house. He did not see
him again until the following Monday. When witness saw him
on the said Friday morning, the said negro was lying down in
defendant's house. He appeared to be a friend of the defendant,
and to be making the defendant's house his home or stopping
place. The defendant did not tell the witness who that negro
was, but. in answer to the witness's direct question as to who
he was, the defendant said that he had seen the negro in Waco,
but did not know who he was, and that he thought the negro
was hanging around his house as a spy. The witness then told
defendant that, in witness's opinion, the negro had been sent to
his house as a spy, and advised defendant to have nothing to do
with him. When witness gave that advice to the defendant, he
did not think the defendant had anything to do with placing
the obstructions on the track, and he cautioned him to place him
on his guard against saying anything to the negro which could
be turned to his disadvantage. The witness did not mean to
express a present opinion as to the guilt or innocence of the
defendant, but, when he advised the defendant against the
negro whom he suspected was a spy, he conscientiously be-
lieved that the defendant was innocent of this offense. On the
next day after the arrest of defendant, the witness told Mr.
Waller that he thought all of the circumstances pointed to the
"negro" (the defendant?) as the party guilty, and that he
thought the "negro" (the defendant?) was "the one to a certain
extent." The witness could not now remember what day it was
that he cautioned defendant against the negro spy (if he was a
spy), but it was between Tuesday and Friday. It was probable

that between the time he cautioned the defendant and the day on which he made the said statement to Waller, the witness discovered new facts connected with the train disaster. He could not say that he did hear anything new, but he would not have changed his opinion as to the complicity of the defendant in the wreck without having something upon which to base such a change. The witness never saw the face of the negro spy, and could not describe him. Defendant told witness that the said negro asked him about the wreck. Basing his opinion on the length of time that elapsed between the time when defendant left Battle's house and the time the train was wrecked, as the witness remembered and estimated that time, he, witness, did not think that defendant could have gone to the cattle guard and placed the obstruction. If the time that did actually elapse between the times mentioned exceeded fifteen minutes—which was not the belief of the witness—then the defendant could have made the trip.

Annie Davis was the next and final witness for the defense. She testified that she lived on Mr. Battle's place in the same house with the defendant, and cooked and washed for the defendant. The witness went to Mr. Battle's house after night on the fatal Tuesday to get some medicine for a sick child. She found the defendant at Mr. Battle's house, and, after getting the medicine, she and the defendant went home. Witness did not know what time it then was, but it was after night. The witness had not gone to bed when, a short time after she and defendant got home, the young Messrs. Battle came by and got defendant to go with them to the wreck. The defendant was sitting in his door when the young men arrived, and had not been away from his house since he came from Battle's with witness.

Cross examined, the witness said that she had not gone to bed when the wreck occurred. Defendant, without taking off his clothes, had laid down on the floor in front of the door. He had taken off his shoes—the shoes he was now wearing. Lou Clayton spent the night at defendant's house on the night of the wreck. The witness was at home when Lou arrived, but could not now say what time she was there. It was about sun down when witness went to Battle's house after the medicine. She did not leave for home until after dark, because, for some reason, the Battles could not give her the medicine at once, and she had to wait for it. Witness had no supper on that night.

'She did not feel hungry and did not cook supper.   Lou Clayton was at witness's house when witness got back from Mr. Battle's house.   Lou slept that night in a bed by herself.   The defendant slept in his own bed.   The witness and her children slept ·on the floor, instead of in the remaining bed, because it was cooler.   Lou Clayton left the defendant's house before sun rise ·on the next morning.   She got to witness's (defendant's) house before the wreck occurred.   Witness did not now know when she next saw Lou Clayton after Wednesday before sun rise, ex-·cept that she went to see her after the arrest of the defendant. Witness went to see Lou Clayton of her own volition, and not at the suggestion of the defendant.   She did not go for the purpose of persuading Lou to appear as a witness for the defendant, because she thought that Lou, appreciating the materiality of the testimony she could give, would do right and .appear as a witness for defendant, of her own accord.   Defend-.ant did not tell the witness, before his arrest, that he had seen Bob and Lou Clayton, and that the latter would testify in his behalf if he should be arrested.   The witness denied that she ·ever told Mr. Henderson that, as soon as she and the defendant got home from Battle's on the night of the wreck, but before it ·occurred, the defendant undressed and went to bed.   The wit-ness told Henderson that Jesse Landman spent the night at ·defendant's house, but did not tell him that on the next morn-·ing Landman went with her to Ed Oliver's house.

Jesse Landman testified, for the State, in rebuttal, that he ·went to Ed Oliver's house on the Tuesday evening of the wreck, .arriving about dusk.   He found Lou Clayton in bed, sick, at ·the said Oliver's house, and she was still sick in that bed when the witness left, about midnight.   Oliver's house was about six miles distant from the defendant's house.   The witness did not remember where he went to or stayed after midnight on the said Tuesday night.   He spent one night at the defendant's house, after the arrest of the defendant, and next morning he went with Annie Davis to Oliver's house.

J. M. Waller, recalled by the State in rebuttal, testified that he had a conversation with Chew Battle on Wednesday, Au-gust 15, 1888, and that Chew Battle, in that conversation, told him, first, that it was about seven o'clock in the evening when .defendant last left his father's house before the wreck.   The witness admonishing him that it was important to be exact as to time, Chew reflected for a moment and then said that he

thought it was about fifteen minutes past seven when the defendant left. The witness afterwards saw Mr. C. R. Battle and told him that Chew had said that it was fifteen minutes past seven when the defendant left the house, and Mr. C. R. Battle replied that he thought that was about the time. Witness further questioned C. R. Battle as to time, and said Battle stated that, at least, it was not later than fifteen minutes past seven when the defendant last left his house on that night. He said further that he had no means of computing time except by his household regulations. Witness then asked him to study over the matter with the view of clearly locating the time, if he could. When witness next saw Mr. C. R. Battle he told witness that he collected his family the evening before and waited until they all agreed upon the time corresponding with the time that defendant left his house on the evening of the wreck, and that, consulting a time piece, he found it to be fifty minutes past seven. A man could go from Battle's house to defendant's house in less than three or four minutes, and an ordinary man could go from defendant's house to the cattle guard and back in fourteen minutes. It would take five minutes to place such obstructions on the track as were placed there on the fatal Tuesday night. A man going on such a mission of destruction as that charged against the defendant would, in all probability, make the trip and do the work in less time than that mentioned by witness.

Dan Ford testified, for the State, in rebuttal, that on the morning after the wreck H. Battle told him and Jenkins that the defendant told him on one occasion "that if the railroad people did not pay him they would always wish they had."

No brief on file for the relator.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. After his indictment for the murder of G. R. Moses and the arrest thereunder appellant sued out a writ of habeas corpus for bail; and the same coming on for hearing before the Hon. Eugene Williams, district judge, bail was refused him. From that judgment this appeal is here taken.

We have given the evidence as shown in the record a most careful consideration, and in our opinion appellant is entitled to bail. Whereupon the judgment is reversed and appellant will

be released from custody upon his execution of a bond with good and sufficient security conditioned as the law directs in the sum of two thousand five hundred dollars for his appearance to answer to said indictment for murder.

Judgment reversed and appellant admitted to bail in the sum of two thousand five hundred dollars.

*Ordered accordingly.*

Opinion delivered December 19, 1888.